**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**FORT MYERS DIVISION**

CASE NO. _____

**CAROL KING LANDSCAPING MAINTENANCE INC., a Florida corporation; and AMERICA AT PLAY, INC. D/B/A BEACH ROAD WINE BAR AND BISTRO, a Florida corporation,**

     Plaintiffs,

vs.

**ALEXANDER ACOSTA, in his official capacity as United States Secretary of Labor; MOLLY E. CONWAY, in her official capacity as United States Acting Assistant Secretary of Labor, Employment and Training Administration; and THOMAS M. DOWD, in his official capacity as Deputy Assistant Secretary of Labor, Employment and Training Administration,**

     Defendants.

_____

**COMPLAINT**
**INJUNCTIVE RELIEF SOUGHT**

1.    At issue in this case is whether a federal agency – the United States Department of Labor ("**DOL**") – has the authority to issue substantive rules that change the requirements for a statutory-based visa program by styling the rule as merely a procedural change.

2.    The H-2B Visa Program ("**H-2B**" or the "**Program**") is an effective and essential program providing seasonal temporary foreign workers employment in non-agricultural positions, where unemployed United States workers ("**American workers**") capable or willing to perform such work "cannot be found in this country." 8 U.S.C. § 1101(a)(15)(H)(ii)(b).

3.      The Program is vital to many small and seasonal businesses throughout the United States that need temporary, non-immigrant seasonal workers to sustain their businesses and keep American workers employed.  Seasonal businesses rely on these temporary, seasonal workers to fill jobs in the seafood, landscaping, reforestation, outdoor amusement, and hospitality industries.  In these niche industries, it is difficult to locate qualified and dependable seasonal employees; the work is temporary and often labor intensive. Employers who use the Program are committed to hiring a legal work force.  The Program helps to reduce illegal immigration by giving employers an alternative to hiring undocumented workers when there are an insufficient number of Americans available for these temporary jobs.  It is a program that keeps American small businesses open, which in turn, sustains American jobs.

4.      The United States Department of Homeland Security (the "**DHS**" or "**Homeland Security**"), which oversees and administers the Program, requires that employers obtain a temporary labor certification (a "**Temporary Certification**") from DOL prior to submitting a petition to DHS for approval to hire seasonal workers.  The demand for Temporary Certifications from DOL increases each year because there is a domestic labor shortage.  Unemployment among American workers has fallen to 3.8%, an 18-year low, which means that there are not enough American workers to fulfill the demand for businesses that require seasonal employment.

5.      DOL contends that it has faced difficulties processing applications with its current system due to the increased demand for Temporary Certifications. DOL seeks to justify this change because of the purported burdens on its network infrastructure during periods at which employers attempt to be the first in line for an application.

6.      On March 4, 2019, DOL published a Notice in the Federal Register titled "Selection Procedures for Reviewing Applications Filed by Employers Seeking Temporary

2

Employment of H-2B Foreign Workers in the United States," 84 Fed. Reg 7399 (March 4, 2019), (the "**Notice**", attached hereto as Ex. 1) announcing that beginning on July 3, 2019, DOL will use a new lottery system to randomly select and process applications filed within the first three (3) days in the season until the agency reaches the 33,000-worker cap set by DHS for H-2B visas (the "**Lottery Selection**").  DOL will thereafter process any remaining applications. While the Notice invited comment from the public, DOL wrongly asserts that the Notice is not a proposed rule issued pursuant to the notice and comment requirements of 5 U.S.C. § 553 ("**notice and comment rulemaking**" or "**informal rulemaking**").

7.      The proposed Lottery Selection will drastically and negatively alter the manner in which Plaintiffs and businesses like Plaintiffs will need to plan for seasonal employment needs. The new Lottery Selection seeks to upend the more dependable/predicable time-stamp process that well-prepared H-2B employers have relied upon to gain access to the first step in the H-2B process – the Temporary Certification upon which the follow-on DHS application visa petition was predicated.  With the new Lottery Selection in place, businesses, such as Plaintiffs, retain little to no benefit from filing timely, compliant applications to DOL.  Instead, DOL will choose to review applications representing the first 33,000 beneficiaries at random, with no initial screening process, and place any remaining timely-filed, robust applications in another bucket of applications from which any remaining winners will be selected. These buckets are not created via time-stamp, but instead applicants are randomly placed into these buckets.  Therefore, businesses will retain little, if any, control or ability to plan for seasonal work requirements. Access to a work force will instead be based solely on chance. DOL will randomly pick winners and losers each season.  Without the ability to plan for their labor requirements, businesses will suffer irreversible financial harm, forcing them to scale back their operations, cancel or default on contracts, lay off full-time

American workers, and, in some cases, shutter their operations entirely. The Notice, in its current form, does not consider *any* of the foregoing consequences.

## JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331, which confers original jurisdiction over all civil suits arising under the Constitution and the laws of the United States, and 28 U.S.C. § 2201 (authorizing declaratory relief), 5 U.S.C. § 601 *et seq*. (Regulatory Flexibility Act), and 5 U.S.C. § 701 *et seq*. (judicial review provisions of the Administrative Procedure Act).

9.     Venue is proper pursuant to 28 U.S.C. § 1391(e).

## PARTIES

10.     Plaintiff, Carol King Landscaping Maintenance, Inc. ("**Carol King Landscaping**") is a commercial landscaping company founded in 1960 located at 7032 Old Cheney Highway, Orlando, FL 32801.  Carol King Landscaping does business throughout Central Florida.  Carol King Landscaping is a small business within the meaning of the Small Business Act.  As a landscaping company, Carol King Landscaping is at its busiest at "growing season," between April and November of a given year.  It experiences increased contracts to perform landscaping work during such summer season, and as such, Carol King Landscaping aims to hire additional lawn technicians to perform landscaping duties.  However, there is immense competition among Carol King Landscaping, other landscaping companies, and other industries -- such as construction and hospitality -- for the same, fixed workforce in the area: those willing to do seasonal work, work outside and perform physical labor.  There are an insufficient number of American workers willing to work in this occupational and geographic area and therefore, Carol King Landscaping relies on temporary employees hired through the

4

H-2B program as lawn technicians to meet its customer demand in the peak summer season. It aims to employ between 35 to 42 lawn technicians per summer season. Carol King Landscaping has historically better ensured access to the Program by filing its application on the very first day it can for the summer season, January 1. There have been years in which Carol King Landscaping has been capped out of the program and received authorization for zero or limited workers. In those years, Carol King Landscaping could not find enough labor to fulfil the contracts it had already booked for the season. Its ancillary costs increased dramatically, and the business was forced to take less business as a result. With the new Lottery Selection, Carol King Landscaping would not have the reliable access to the Program that it needs to plan for the season and would reduce the number of American workers we hire for administrative and management positions. The harm it suffered in years past would again be suffered – all due to DOL's new randomization process. It will not know how many employees it will have in order to book the appropriate amount of business. It estimates that like in the years in which it was capped out of the Program, its revenues will decrease.

11.     Plaintiff, America at Play, Inc., d/b/a Beach Road Wine Bar and Bistro (the "**Bistro**") is a restaurant established under the laws of the State of Florida in 2001. It is located at 1350 Beach Road, Englewood, FL 34223. The Bistro is a small business within the meaning of the Small Business Act. Englewood is popular with tourists between the months of November and March. The Bistro experiences an increased flow of customers in such winter season, and the Bistro aims to hire additional kitchen staff for the winter season. However, there is immense competition between the Bistro and surrounding restaurants for the same workforce to meet this demand. There are an insufficient number of American workers willing to work in this occupational and geographic area and therefore, the Bistro relies on temporary employees

hired through the H-2B program to staff its kitchen to meet its customer demand in the peak winter season.  In the winter season, the Bistro usually employs eight (8) such H-2B temporary workers and generally applies for these workers on or about July 3 of each year. The new Lottery Selection will have a significant impact on the Bistro's ability to plan for the season. Random selection will create more uncertainty as to whether the Bistro will have access to the workforce it needs to sustain its business.  Without being able to ensure access to the Program, the Bistro will be forced to understaff its kitchen, losing out on potential customers hiring fewer American workers, and decreasing its revenues.  It will also lose the ability to plan for expansion, as it had been doing with the success of utilizing H-2B workers.  In either event, the Bistro will be imminently and irreparably injured.

12.     Defendant, Alexander Acosta ("**Acosta**"), is Secretary of Labor.  The Secretary of Labor is responsible for all functions of DOL, including the Office of Foreign Labor Certification within the Employment and Training Administration, which asserts jurisdiction over the administration of the H-2B Program. Acosta is sued in his official capacity; his official residence is Washington, D.C. and the Notice was issued out of Washington, D.C.

13.     Defendant, Molly E. Conway ("**Conway**"), is the Acting Assistant Secretary, Employment and Training Administration. Conway is sued only in her official capacity; her official residence is in Washington, D.C. and the Notice was issued out of Washington, D.C.

14.     Defendant, Thomas M. Dowd ("**Dowd**"), is the Deputy Assistant Secretary of the Employment and Training Administration.  Dowd issued the Notice and is sued in only his official capacity. His official residence is Washington, D.C. and the Notice is issued out of Washington, D.C.

## BACKGROUND OF THE H-2B VISA PROGRAM

15.     For decades, Congress has authorized the Executive Branch, first the Attorney General and later, the Secretary of Homeland Security, to issue visas to foreign workers in occupations where there is an insufficient number of American workers. For example, the H-1 visa program, which is not at issue here, authorizes the issuance of work visas for qualified foreign nationals in "specialty occupations," *e.g.,* engineering, medicine, information technology. *See* 8 U.S.C. § 1184(i).  The H-2 visa program authorizes the issuance of visas for seasonal or temporary workers in two areas: H-2A work visas are available for temporary and seasonal agricultural workers; and H-2B work visas are available for temporary non-agricultural workers.

16.     H-2B was created in 1986 by the Immigration Reform and Control Act ("**IRCA**") amendments to the Immigration and Nationality Act, 8 U.S.C. § 1101 *et seq.* ("**INA**"). Before the creation of the separate H-2A and H-2B programs, a unified H-2 temporary foreign worker program existed for both agricultural and non-agricultural employment. The name "H-2B" comes from the statutory provision that created the program, INA § 101(a)(15)(H)(ii)(b), codified at 8 U.S.C. § 1101(a)(15)(H)(ii)(b). The specific purpose of H-2B is to provide non-agricultural employers in the United States an opportunity to hire interested foreign employees to meet the employers' temporary employment needs.

17.     Under the Program, the Secretary of Homeland Security is authorized to admit an alien "having residence in a foreign country which he has no intention of abandoning who is coming temporarily to the United States to perform other temporary service or labor if unemployed persons capable of performing such service or labor cannot be found in this country . . . ." 8 U.S.C. § 1101(a)(15)(H)(ii)(b).

18. The INA sets the annual number of employees who may be issued H-2B visas or otherwise provided H-2B nonimmigrant status to perform temporary non-agricultural work at 66,000, to be distributed semi-annually. 8 U.S.C. § 1184(g)(1)(B). These 66,000 H-2B visas are allocated in two allotments of 33,000 beneficiaries on April 1 and October 1 of each year. Thus, the earliest start date for foreign workers for the first allotment of visas is April 1. The Temporary Certifications underlying these petitions are generally applied for on January 1 and July 3 of each year.

19. In recent years, Congress has authorized each year through its annual spending bills Homeland Security to adjust the visa cap based on need. For example, this year, Homeland Security has authorized issuing an additional 30,000 H-2B visas for use in fiscal year 2019.

## RULEMAKING AUTHORITY

20. As a general matter, the "Secretary of Homeland Security [is] charged with the administration and enforcement of this chapter and all other laws relating to the immigration and naturalization of aliens." 8 U.S.C. § 1103(a)(1).

21. Congress has directed the Secretary to "establish such regulations ... and perform such other acts as he deems necessary for carrying out his authority under the provisions of this chapter." *Id.* § 1103(a)(3). Congress has provided that the Secretary "is authorized to confer or impose upon any employee of the United States, with the consent of the head of the Department or other independent establishment under whose jurisdiction the employee is serving, any of the powers, privileges, or duties conferred or imposed by this chapter or regulations issued thereunder upon officers or employees of the Service." *Id.* § 1103(a)(6). "Service means U.S. Citizenship and Immigration Services, U.S. Customs and Border Protection, and/or U.S.

Immigration and Customs Enforcement, as appropriate in the context in which the term appears." 8 C.F.R. § 1.2.

22.    One of the Homeland Secretary's statutory responsibilities is the administration of the Program.   In particular, "[t]he admission to the United States of any alien as a nonimmigrant shall be for such time and under such conditions as the [Secretary] may by regulations prescribe." 8 U.S.C. § 1184(a)(1).  Section 1101(a)(15)(H)(ii)(b) of Title 8 is the source of the term "H-2B."   Section 1184(c)(1) of Title 8 of the U.S. Code provides: "The question of importing any alien as a nonimmigrant ... in any specific case or specific cases shall be determined by the [Secretary of DHS], *after consultation* with appropriate agencies of the Government, upon petition of the importing employer." (emphasis added).

23.    Unlike the DHS, DOL is not authorized to issue substantive rules for the H-2B Program under the INA or any other statutory authority.

### DOL'S CONSULTATION ROLE

24.    To ensure that the H-2B visas are only issued for occupations and in geographic areas in the United States where American employees cannot be found, the INA requires the Secretary of Homeland Security to make determinations about the advisability of issuing H-2B visas "after consultation with appropriate agencies of the Government upon petition of the importing employer." 8 U.S.C. § 1184(c)(1)

25.    Pursuant to the statutory direction to consult with appropriate agencies, DHS and its predecessors have looked to DOL for advice on whether United States workers capable of performing the desired temporary services or labor are available, and whether the foreign workers' employment will adversely affect the wages and working conditions of similarly employed United States workers. *See, e.g.*, 8 C.F.R. § 214.2(h)(6)(iii)(A).

26.     Beginning in 2008, DHS began to require that employers petitioning DHS for H-2B visas must "apply for a Temporary Certification with the Secretary of Labor." 8 C.F.R. § 214.2(h)(6)(iii)(A).   Under the current regulations issued by DHS, it is expected that as part of its review process, DOL will advise DHS about whether the proposed employment would have an adverse effect in the form of wage depression on similarly employed United States workers.

27.     The standards and procedures governing the submission and processing of H-2B labor certification applications are set forth in 20 C.F.R. § 655.15 and §§ 655.30-655.35. These regulations generally require, among other things, that a registered employer with a non-emergency situation seeking an H-2B Temporary Certification file a completed H-2B application with the National Processing Center ("**NPC**") designated by the Department of Labor's Office of Foreign Labor ("**OFLC**") Administrator. 20 CFR § 655.15.

28.     DOL's regulations require the employer, at the time of filing, to include a signed and dated appendix attesting to compliance with all regulatory assurances and obligations; a valid Prevailing Wage Determination ("**PWD**"); a copy of the job order submitted concurrently to the State Workforce Agency serving the area of intended employment; a copy of all contracts and agreements with foreign labor recruiters executed in connection with the job opportunities; and all other applicable documentation supporting the H-2B application. 20 CFR § 655.15(a).

29.     Employers that fail to register under the procedures in § 655.11 and/or that fail to submit a PWD obtained under § 655.10 will not be eligible to file and their H-2B applications will be returned without review.

30.     Currently, employers have the option of filing Temporary Certification applications electronically.   The NPC sequentially assigns Temporary Certification applications to NPC analyses based on the calendar receipt date and time measured to the millisecond.   Once each H-

2B application is assigned, NPC analysts initiate review of each application in the order of receipt date and time.

31.     Pursuant to certain of these DHS labor certification regulations, DOL is directed to determine whether (1) qualified workers in the United States are available to fill the petitioning employer's job and whether (2) an alien's employment will adversely affect wages and working conditions of similarly employed American workers. 8 CFR §§ 214.2(h)(6)(iii)(A), (D).  As part of the certification process, the prospective employer is required to advertise for the position in U.S. newspapers and only if the employer fails to attract a sufficient number of American workers to meet its employment requirements will DOL issue the employer a Temporary Certification. If, after reviewing an employer's job offer and recruitment efforts, the Secretary of Labor determines that American workers are not available to fill the jobs described in the employer's application and that the offered terms of work will not adversely affect similarly employed American workers, DOL issues a Temporary Certification that the employer must attach to the H-2B visa petition it submits to DHS.  8 C.F.R. §§ 214.2(h)(6)(iii)(C) and 214.2(h)(6)(iv)(A).

32.     Notably, a "petitioner may not file an H-2B petition unless the United States petitioner has applied for a labor certification with the Secretary of Labor ... within the time limits prescribed or accepted by each, and has obtained a favorable labor certification determination...." *Id.* § 214.2(h)(6)(iii)(C). Without a Temporary Certification from DOL, a petitioner cannot apply for and obtain H-2B visas from Homeland Security.  DHS provides no mechanism for an employer to challenge DOL's determination on this question.

33.     An employer seeking an H-2B visa for workers may file its Temporary Certification applications no more than 90 days before the first date the employer seeks to employ seasonal

workers. Thus, the earliest an employer can file a labor certification application at DOL for the April 1 visa allotment is January 1, and the earliest that an employer can file an application for an October 1 visa allotment is July 3.

34.     Because of the demand for H-2B visas, businesses must ensure their access to a Temporary Certification within the allotted visa cap.  DOL's current "first-in, first-out" time-stamp system allows businesses a measure of certainty in obtaining a Temporary Certification by rewarding employers for filing thorough and mistake-free applications. However, the highly-technical and specialized process to successfully obtain a Temporary Certification requires that these businesses invest heavily in ensuring that their applications are prepared properly and are ready for filing at the earliest possible availability.   These efforts are essential and can give businesses a competitive advantage because if an application for a Temporary Certification is rejected, DHS and DOL provide no mechanism to challenge DOL's Temporary Certification determinations.

35.     Businesses like Plaintiffs have better ensured their access to the H-2B Program by making these investments, which allow them to meticulously prepare their Temporary Certification applications for an early and timely filing.  They plan for their applications far in advance of the season to ensure their businesses can operate with necessary, seasonal labor. Without such an investment, these businesses would face increased barriers to employing foreign, seasonal labor within a system that is already highly competitive.

### DOL'S NOTICE

36.     On March 4, 2019, DOL published a Notice in the Federal Register announcing that beginning on July 3, 2019 it is creating a new way to review and process Temporary

Certification requests by employers seeking to hire foreign, temporary workers. *Notice,* 84 Fed. Reg 7399.

37.     Instead of processing the applications for certification on a "first-in, first-out" time-stamp basis, DOL intends to rewrite the rules by using a new Lottery Selection to randomly select and process applications filed within the first three (3) days in the season until the agency reaches the 33,000-worker cap set by DHS for H-2B visas.

38.     DOL seeks to justify this change because of the purported burdens on its network infrastructure during periods at which employers attempt to be the first in line for an application. DOL has stated that during the "intense competition for H-2B visas in recent years . . . [DOL] typically experiences significant 'spikes' in H-2B applications." 84 Fed. Reg 7399.  For the 2018 season, DOL sequentially marked each application when filed, measured to the millisecond.  DOL has asserted that the first wave of applications at the January 1, 2019 opening period for the April 1 allotment of Temporary Certifications "caused the electronic filing system to become unresponsive and prevented almost all employers from filing H-2B applications[,]" and that the proposed lottery is an attempt to remove the incentive of "rushing to file."  DOL does not assert, however, that this electronic infrastructure cannot be fixed or bolstered.

39.     However, the Notice does not comply with the notice and comment requirements of 5 U.S.C. § 553.  Among other things, it is beyond dispute that, (i) DOL never published a *proposed* rule and instead merely issued a final rule describing the rule change, and (ii) while the agency invited comments from affected persons, it did not publish these comments.

40.     By law, any agency statement "of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency" must undergo notice and

comment rulemaking.  5 U.S.C. § 551(4).  This rulemaking consists of: (1) advance publication in the Federal Register of the proposed rule or its substance; (2) opportunity for public participation through submission of written comments, with or without oral presentation; and (3) publication of the final rule, incorporating a concise statement of its basis and purpose, thirty days before its effective date. 5 U.S.C. § 553. A substantive rule is any rule that "is likely to have considerable impact on ultimate agency decisions" or that "substantially affects the rights of those over whom the agency exercises authority." *Pickus v. United States Bd. of Parole*, 507 F.2d 1107, 1113-14 (D.C. Cir. 1974).

41.     "The purposes of according notice and comment opportunities were twofold: to reintroduce public participation and fairness to affected parties after governmental authority has been delegated to unrepresentative agencies, and to assure that the agency will have before it the facts and information relevant to a particular administrative problem, as well as suggestions for alternative solutions." *Am. Hosp. Asso. v. Bowen*, 834 F.2d 1037, 1044 (D.C. Cir. 1987) (internal citations and quotations omitted).

42.     DOL seeks to evade the statutory obligations and scrutiny required by the APA by couching the Notice as a "procedural rule," which is exempt from the requirements of notice and comment rulemaking.  Courts have defined agency procedural rules as the "technical regulation of the form of agency action and proceedings … which merely prescribes order and formality in the transaction of … business." *Pickus*, 507 F.2d at 1113.

43.     DOL seeks to circumvent the requirements of notice and comment rulemaking because it does not have the statutory authority to issue substantive rules.  Congress has also not given any directive, express or otherwise, that DHS can delegate its rulemaking authority to a different agency.

44.     The transparency afforded to notice and comment rulemaking would also expose that the Notice is arbitrary and capricious.  An agency rule is arbitrary and capricious if the agency relied on factors that Congress did not intend for it to consider, "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983).  The Notice, even if issued with proper authority, is arbitrary and capricious because it wholly failed to consider the Lottery Selection's impact on the entities it was most likely to affect.

45.     Agencies are also required to undergo a Regulatory Flexibility Act ("**RFA**") analysis during notice and comment rulemaking, which requires that agencies analyze the impact of any substantive rule on small businesses and address any meaningful alternatives to the rule.  Here, DOL did not conduct an RFA analysis as to its Lottery Selection, nor did it address meaningful alternatives. If it had, the analysis would have certainly shown that the impact of the Notice on small business is severe.

46.     By law, agencies are also required to undergo an Executive Order 12866 analysis during notice and comment rulemaking, which requires agencies to conduct a cost-benefit analysis of any major rule it wishes to propose or finalize. Here, there is no assessment of such analysis in DOL's Notice. DOL states the purported benefits of the Lottery Selection without assessing the cost to the businesses that its Lottery Selection would affect, as addressed *infra*.

## EFFECT OF RULE ON PLAINTIFFS

47.     The Notice and its Lottery Selection substantively affects the rights of applicants in their ability to obtain Temporary Certifications.  Essentially, the rule redefines DOL's

consulting role by allowing the agency discretion to randomly select winners and losers with regard to which applicants receive Temporary Certifications.  Since a Temporary Certification is a prerequisite, DOL's Lottery Selection usurps DHS's authority and discretion over which H-2B visa program applications to approve.

48.     Plaintiffs need H-2B seasonal workers because there is an insufficient number of American workers available and willing to take these seasonal jobs.

49.     Prior to the Lottery Selection, businesses always had the ability to better ensure access to the Program's benefits by filing their fully compliant application at the first possible moment. The new Lottery Selection seeks to upend the more dependable/predictable time-stamp first-in/first-out access of seasonal workers upon which businesses rely.  With the new Lottery Selection in place, businesses retain no benefit from filing timely, compliant applications to DOL.

50.     Instead, DOL will choose to review applications representing the first 33,000 beneficiaries at random, with no initial screening process, and discard any remaining timely-filed, robust applications into subsequent buckets of applications that will again be subject to random selection.  This change will have a substantive impact on Plaintiffs, who rely on and employ seasonal workers.  Plaintiffs will still be compelled to spend the time and resources to craft a timely, well-drafted Temporary Certification application, but retain no control to guarantee that their application will be reviewed.

51.     Therefore, the Notice prevents Plaintiffs from better ensuring access to the Program and effectively planning their labor needs for the season.  Since businesses will have no way to ensure that their application will be reviewed, they will no longer be able to reliably predict whether or how many temporary workers they will be able to hire for an upcoming season.

52.     The success and survival of businesses such as Plaintiffs' require the ability to plan for their temporary labor needs. This inability to plan for the season will prevent Plaintiffs and similar businesses from reliably predicting how many temporary workers they can hire for the season causing massive disruption to those businesses and throughout the industries that employ seasonal labor.

53.     Without a way to ensure reliable access to the Program, Plaintiff, Carol King Landscaping, will not be able to predict how many contracts it can take on during the summer season.  *See* Ex. 2, Decl. of Bruce Bachand ("**Bachand Decl**.")  ¶¶ 13-14.  This will decrease its revenues, as Carol King Landscaping will not be able to secure as much business compared to years in which it used H-2B workers.  *Id.* ¶¶ 11-12. In addition, hiring domestic temporary labor increases Carol King Landscaping's ancillary costs dramatically.  *Id.* ¶ 11. The businesses benefit from H-2B workers who gain experience and return each year. *Id.*  When the business is deprived access to such returning workers, it has seen its costs increase, such as training costs and workers' compensation claims associated with new workers who lack similar experience. *Id.* ¶¶ 11, 13.

54.     Without a way to ensure access to the Program, Plaintiff, the Bistro, will not be able to serve as many customers to meet the demand it faces in the winter season.  *See* Ex. 3, Decl. of Jill Athans-Hemmes ("**Athans Decl**.") ¶ 10.  Its revenues have been increasing each year, and it had plans to expand its kitchen to accommodate even more customers.  *Id.* ¶ 8. However, if the Bistro is unable to rely on the Program, it cannot plan for expansion.  *Id.* ¶ 13. On the contrary, the Bistro will be forced to turn away customers, hire fewer American workers, and face significant losses in revenue.  *Id.*

55.     Additionally, businesses like and including Plaintiffs would not be able to gauge its labor supply to plan its operations for the season. Bachand Decl. ¶¶ 13-14; Athans Decl. ¶ 13.  This would cause irreversible financial harm, force Plaintiffs' businesses to scale back operations, cancel or default on contracts, lay off full-time American workers, and in some cases, shutter their operations entirely.

<u>**COUNT I**</u>
**The Notice Is Violative of the APA Because It Did Not Undergo Notice and Comment Rulemaking (5 U.S.C. § 706(2)(D) & 5 U.S.C. § 553)**

56.     Plaintiffs incorporate by reference the allegations set forth in ¶¶ 1 - 55, above.

57.     The Administrative Procedure Act ("**APA**") broadly defines an agency rule to include "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency and includes the approval or prescription for the future of rates, wages, corporate or financial structures or reorganizations thereof, prices, facilities, appliances, services or allowances therefor or of valuations, costs, or accounting, or practices bearing on any of the foregoing (.)"

58.     The Notice and its Lottery Selection is a substantive rule, despite DOL labeling it a procedural rule change.  DOL did not publish a notice of proposed rulemaking as to the Lottery Selection. While DOL invited comments from affected persons, it did not publish these comments.  And though DOL explained some of its basis for the rule, it simply issued a final rule and its effective date without the opportunity to consider comments from the public.

59.     The Notice is likely to have considerable impact on ultimate agency decisions and will substantially affect the rights of those over whom the agency exercises authority. *See generally* Bachand Decl.; Athans Decl.

18

60.     The Notice is not simply a technical regulation of the form of agency action and proceedings that prescribes order and formality in the transaction of business.

61.     Therefore, the Notice was "without observance of procedure required by law[,]" and therefore is in violation of 5 U.S.C. § 706(2)(D) and 5 U.S.C. § 553.

**WHEREFORE**, the Notice should be vacated.

<u>**COUNT II**</u>
**The Notice Is Violative of the APA Because It Exceeds Defendants' Statutory Authority**
**(5 U.S.C. §§ 706(2)(A), (C) & 5 U.S.C. § 558)**

62.     Plaintiffs incorporate by reference the allegations set forth in ¶¶ 1 - 61, above.

63.     The Notice is a substantive rule that required notice and comment rulemaking.

64.     The APA requires agencies to include "reference to the legal authority under which the rule is proposed[.]" 5 U.S.C. § 553(b)(2). The Notice does not reference any statute that authorizes the Secretary Labor or his delegatee to issue the substantive rule.

65.     The required statutory reference was omitted because Congress has not authorized the Secretary of Labor to issue legislative rules affecting the H-2B visa program. Moreover, nothing in Title 29 of the United States Code grants the Secretary of Labor general rulemaking authority. Absent specific rulemaking authority in either Title 8 or Title 29 of the United States Code and absent general rulemaking authority in Title 29, the Secretary of Labor has no authority to issue this Notice.

66.     As a result, DOL's issuance of the Notice was "in excess of . . . authority" in violation of 5 U.S.C. §§ 706(2)(A), (C), 5 U.S.C. § 558, and therefore must be vacated.

**WHEREFORE**, the Notice should be vacated.

## COUNT III
### The Notice Is Violative of the APA Because DOL Failed to Properly Perform an RFA Analysis (5 U.S.C. § 601 *et seq.*)

67.     Plaintiffs incorporate by reference the allegations set forth in ¶¶ 1 – 66, above.

68.     The Notice and DOL are subject to the RFA because it has an impact on small businesses.  The RFA requires agencies, as part of the rulemaking process, to conduct an initial and then a final regulatory analysis of the economic impact that a putative rule will have on small entities, to set out the less onerous alternatives considered by the agency, and to discuss the agency's rationale for declining to adopt these less costly alternatives.

69.     DOL did not complete an RFA analysis when it issued the Notice.

70.     DOL did not take into account the significant adverse economic impact on small, seasonal businesses, including businesses like Plaintiffs.  Due to the lottery system, businesses will be faced with a decreased chance of receiving their H-2B workers. This will significantly increase their ancillary costs such workers' compensation, overtime, training etc.   These higher costs will undermine the affected business's competitive advantage and viability.  Defendants took none of this into account when failing to complete an RFA analysis.

71.     Therefore, the Notice is in violation of 5 U.S.C. § 601 for the DOL's failure to complete an RFA analysis.

**WHEREFORE**, the Notice should be vacated.

## COUNT IV
### The Notice is Violative of the APA because it is Arbitrary and Capricious (5 U.S.C. § 706(2)(A))

72.     Plaintiffs incorporate by reference the allegations set forth in ¶¶ 1 – 71, above.

73.     The Notice is arbitrary and capricious for the reasons stated above and also because:

a.   DOL did not undergo proper notice and comment rulemaking procedures and therefore the Notice is without observance of procedure required by law;

b.   DOL lacked rulemaking authority and therefore the Notice is inconsistent with law;

c.   DOL usurps the role of DHS by arbitrarily deciding which applicants will receive an H-2B visa;

d.   DOL did not conduct any analysis pursuant to Executive Order 12866, which requires agencies to conduct a cost-benefit analysis of any major rule it wishes to propose or finalize;

e.   DOL did not conduct a Regulatory Flexibility Analysis;

f.   DOL failed to provide data or other evidence to support its programmatic changes; and

g.   DOL did not provide any evidence that any of the new provisions would avoid injuring U.S. employers and employees.

**WHEREFORE**, the Notice should be vacated.

**<u>PRAYER FOR RELIEF</u>**

**WHEREFORE**, based on the foregoing Complaint, Counts I-IV, Plaintiffs pray that the Court:

1.      Enter a temporary restraining order and preliminary injunction, pending a decision on the merits, enjoining the Defendants (i) from implementing the Notice titled "Selection Procedures for Reviewing Applications Filed by Employers Seeking Temporary Employment of H-2B Foreign Workers in the United States," 84 Fed. Reg 7399 (March 4, 2019);

2.      Enter a declaratory judgment as to Counts I, II, and IV that the Notice is invalid, and enter an order vacating the Notice and permanently enjoining Defendants from implementing it;

3.      Enter a declaratory judgment as to Count III that DOL failed to undertake the required Regulatory Flexibility Act analysis and a permanent injunction to prohibit Defendants from implementing the Notice or otherwise giving effect to the Notice until such time as the head of the agency with proper rulemaking authority discharges his or her responsibilities under the Regulatory Flexibility Act to the satisfaction of the Court, and retain jurisdiction of this case to ensure compliance with the Regulatory Flexibility Act;

4.      Award Plaintiffs their costs and expenses, including reasonable attorney's fees whether under the Equal Access to Justice Act or otherwise, and expert witness fees; and

5.      Award such further and additional relief as is just and proper.

Dated:  July 1, 2019

Respectfully submitted,

*/s/ Brian H. Koch*

CARAN ROTHCHILD
Florida Bar No. 983535
rothchildc@gtlaw.com
BRIAN H. KOCH
Florida Bar No. 637335
kochb@gtlaw.com
GREENBERG TRAURIG, P.A.
401 East Las Olas Boulevard
Suite 2000
Fort Lauderdale, FL 33301
Telephone:  954.765.0500
Facsimile:  954.765.1477


LAURA F. REIFF
(*pro hac vice* to be submitted)
reiffl@gtlaw.com
MICHAEL R. SKLAIRE
sklairem@gtlaw.com
(*pro hac vice* to be submitted)
THOMAS J. MCKEE, JR.
mckeet@gtlaw.com
(*pro hac vice* to be submitted)
GREENBERG TRAURIG, LLP
1750 Tysons Boulevard, Suite 1000
McLean, Virginia 22102
Telephone:  703.749.1300
Facsimile:  703.749.1301